CANN and SWITZER, Appellants, v. THE RECTOR, WARDENS AND VESTRYMEN OF THE CHURCH OF THE REDEEMER OF THE CITY OF ST. LOUIS and TROTMAN, Respondents.

St. Louis Court of Appeals, February 21, 1905.

1. **PRACTICE: Contract: Quantum Meruit: Partial Performance.** A party who has fallen short of fully performing his obligation under a contract may be entitled to maintain an action *quantum meruit* for a substantial benefit resulting to the other party from partial performance.

2. ——: ——: ——: **Party Prevented From Performing.** One may have a remedy *quantum meruit* when the other party prevents full performance of the contract by him instead of seeking damages on the contract for breach.

3. ——: ——: ——: **Waiver of Damages.** Where plaintiff sued for damages on account of breach of contract by the defendant, alleging facts which showed that he was prevented from performing by default of the defendant, but waived in open court damages for breach of the contract, the waiver was equivalent to an amendment so that his action was an action *quantum meruit.*

4. **CONTRACT: Architects: Rejection of Plans.** Where architects drew plans and specifications for the building of a church under a contract with the vestry, the governing body of the church, they could not recover for the work done, if they disregarded instructions given to them by the vestry as to how costly a house plans should be prepared for.

5. ——: ——: ——. Where the contract of the vestry with the architects provided that the latter should provide plans, specifications, etc., "under the direction and to the satisfaction of the owners," if the architects provided plans without asking or receiving directions as to the kind of house desired, the vestry had the right in good faith to reject such plans as were not satisfactory to them, on the ground that the building planned was too expensive.

6. ——: ——: ——. But where the vestry rejected the plans of the architect on the ground that the building was too expensive, the architects, in an action for the value of the work done, could recover by showing that the vestry authorized

the plans which were prepared, either directly by its own action, or by an agent whose act was originally authorized or subsequently ratified.

7. ———: ———: ———. The fact that the plans were retained for five or six weeks by the president of the vestry, that a picture of the perspective of the proposed building was framed and hung up in the vestry room by the vestrymen, when there was no evidence as to what it would cost to build such a house, would not be sufficient to show an acceptance of the plans so as to prevent the defense that they called for too expensive a building and for that reason were not satisfactory.

8. AGENCY: President of Vestry: Authority. In the absence of evidence showing the internal regulations of Episcopal churches, it cannot be assumed that the rector of such a church who was also president of the vestry, had authority such as usually belongs to presidents of corporations, so as to bind the vestry by his contracts in the transaction of its necessary business.

9. ———: Board of Trustees: Appointment of Agent. The appointment of an agent authorized to act for the trustees or directors of a corporation need not be by formal vote or resolution. Such agent may be appointed informally without vote, but the action must be taken by the directors when assembled as a board, and cannot legally result from the assent of a majority given singly when not thus assembled.

10. CONTRACT: Architects: Rejection of Plans. In an action by architects for the value of work done on plans and specifications under a contract with the vestry of an Episcopal church, which contract provided that plans, specifications, etc., should be "under the direction and to the satisfaction of the owners," the vestry had not the right to reject the plans as unsatisfactory because they called for a building that was too expensive, if it was shown that the house called for by the plans was such as they would be willing to erect at a reasonable price, but it was too expensive because the prices then prevailing were unreasonable.

11. ———: ———: ———. Nor could they reject the plans on the ground that they were unsatisfactory as being too expensive if they failed to inform themselves of the price of labor and materials.

12. ———: ———: ———. They could only reject them in "good faith," which means they must have found substantial fault in the work itself; they could not reject it because of subsequent changes of conditions or a change of mind in regard to the work.

13. ———: ———: ———: **Presumption.** Although some of the vestrymen were shown to have acted in bad faith, in the absence of proof that a majority of them acted from a wrong motive, the presumption obtains that the plans were rejected in good faith because they were not satisfactory as the contract required them to be.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*Xenophon P. Wilfley, Crawley & Jamison* for appellants.

(1) It is well settled law in this and other States that the acts of a corporation may be proved by the testimony of witnesses in the same manner as the acts of individuals. Taussig v. Railway, 166 Mo. 32, 65 S. W. 969; Hotel Co. v. Newman, 30 Mo. 118; Bank v. Gilstrap, 45 Mo. 419; Bank v. Coal Co., 86 Mo. 125; Bank v. Fricke, 75 Mo. 184; Cook on Corporation (4 Ed.), Vol. 2, Sec. 714; Allis v. Jones, 45 Fed. Rep. 148; Melledge v. Boston, etc., Co., 59 Mass. 158; Pickett v. Abney, 84 Tex. 65. Scott v. Railroad, 86 N. Y. 200; Tibbals v. Water Co., 10 Wash. 329; Outterson v. Paper Co., 20 N. Y. Sup. 980. (2) The vestry was the controlling body of defendant corporation and Dr. Trotman, besides having express authority to enter into contract with plaintiffs was its president. The directors of a corporation have authority to delegate the officers, agents or executive committees with power to transact not only ordinary and routine business, but business requiring the highest degree of judgment and discretion.

No formal action of the board of directors is necessary in order to confer this authority; and the power of such agent is governed by the general law of agency. Jones v. Williams, 139 Mo. 1, 39 S. W. 486, 40 S. W. 353; Ferguson v. Transportation Co., 79 Mo. App. 352; Deg-

nan v. Thoroughman, 88 Mo. App. 62; Roth v. Wire Co., 94 Mo. App. 236, 68 S. W. 594; Ins. Co. v. St. Mary's Seminary, 52 Mo. 480; Chenoweth v. Express Co., 93 Mo. App. 198; Bullock v. Lumber Co., 41 Pac. Rep. 367; Cook on Corporations (4 Ed.), Vol. 2, Sec. 726.

(3) Trotman being the president, it will be presumed in the absence of a showing to the contrary that he had authority from defendant company to approve and accept the plans and specifications prepared by plaintiffs, and the burden was on defendant to show the contrary. Burkamp v. Healey, 72 S. W. Rep. 759; Lungstrass v. Ins. Co., 57 Mo. 107; Campbell v. Pope, 96 Mo. 472, 10 S. W. 187.

(4) Even though it were not too late for the vestry to act it was not within its power to arbitrarily reject plaintiff's work. They could do so only upon some reasonable and valid ground and the question of performance was for the jury. Kinnerk v. Ball Club, 92 Mo. App. 669; Dinsmore v. Livingston County, 60 Mo. 241; Lumber Co. v. Warner, 93 Mo. 374, 6 S. W. 210; Williams v. Railroad, 112 Mo. 463, 20 S. W. 631.

(5) Where a person employed to do a piece of work is wrongfully prevented from completing the work, he may sue for breach of contract or he may elect to treat the contract as rescinded and recover on a *quantum meruit* for the services rendered. Ream v. Watkins, 27 Mo. 516; Warden on Contracts, Sec. 715; Mitchell v. Scott, 41 Mich. 108; Glover v. Henderson, 120 Mo. 375, 25 S. W. 175; Warder v. Seitz, 157 Mo. 49, 57 S. W. 537; Turney v. Baker, 103 Mo. App. 390, 77 S. W. 479; Whart. on Cont., sec. 715.

So a contractor who has been prevented from completing his job, may waive the action for damages and sue for the value of work done and materials furnished. McCullough v. Baker, 47 Mo. 401; Fitzgerald v. Allen et al., 138 Mass. 234.

Such is the plaintiff's petition in this case, and it is clearly a declaration upon a *quantum meruit*. Ehrlich v. Ins. Co., 88 Mo. 249; Brown v. Kimmel, 67 Mo. 430.

*Block, Sullivan & Erd* for respondent.

(1) The petition declares on a special contract, and not on *quantum meruit*. Ehrlich v. Ins. Co., 88 Mo. 257; Eyerman v. Cemetery Ass'n, 61 Id. 490; Chapman v. Currie, 51 Mo. App. 40. (2) Plaintiffs having been employed to furnish plans for a building to cost $60,000, or $65,000 can not recover for plans calling for twice that expenditure. Moneypenny v. Hartland, 11 E. C. L. 414; Smith v. Dickey, 74 Tex. 61; Emerson v. Kunzell, 62 S. W. 552; 2 Am. and Eng. Ency. Law (2 Ed.), p. 818. (3). (a) The president of the vestry had no implied authority to bind defendant by approving the plans. Degnan v. Thoroughman, 88 Mo. App. 64; 3 Clark and Marshall's Corporations, p. 2130; Ferguson v. Transportation Co., 79 Mo. App. 358; St. Patricks v. Gavalon, 82 Ill. 170; Catron v. First Universalist, 46 Iowa 106; Bank v. St. Anthony's Church, 109 N. Y. 512; Constant v. Rector, etc., St. Albans, 4 Daly 305; Packard v. Universalist Society, 10 Met. (Mass.) 427. (b) Such authority could be conferred only by the vestry when assembled as such. Barcus v. Road Co., 26 Mo. 105; Johnson v. School Dist., 67 Mo. 321; State to use v. Tiedeman, 69 Mo. 518; Hill v. Mining Co., 119 Mo. 29, 24 S. W. 223. (c) And the burden of proving that such authority had been in fact conferred rested with plaintiffs. Johnson v. Hurley, 115 Mo. 519, 22 S. W. 492; Spurlock v. Railway, 125 Mo. 404, 28 S. W. 634; Summer v. Lord, 92 Mo. 117. (4) (a) The plans were to be satisfactory and were not, hence there could be no recovery. Dinsmore v. Livingston Co., 60 Mo. 241; Wiliams v. Railway, 112 Mo. 463; s. c., 153 Mo. 487, 20 S.

W. 631; Eldridge v. Fuhr, 59 Mo. App. 44; Blaine v.
Knapp, 140 Mo. 250, 41 S. W. 787; Williams v. Rail-
way, 85 Mo. App. 210; McCormick v. Finch, 100 Mo.
App. 642, 75 S. W. 373; Barrett v. Coal Co., 51 W. Va.
416; Seely v. Wells, 120 Pa. St. 69; Singerly v. Thayer,
108 Id. 291; Pennington v. Howland, 41 Alt. (R. I.)
890; Brown v. Foster, 113 Mass. 136; 17 L. R. A. 207
note.   (b) If the decision of respondent's vestry was
fraudulent, and that fact would avail plaintiffs any-
thing, the burden rested on them to show it.    (5)
Plaintiffs could not recover *quantum meruit* because re-
spondent had not used the plans.   Yeats v. Ballantine,
56 Mo. 535; Moore v. Mfg. Co., 113 Mo. 108, 20 S. W.
975; Keith v. Ridge, 146 Mo. 90, 47 S. W. 904; Light
Co. v. Dowd, 47 Mo. App. 108; Lumber Company v.
Snyder, 65 Mo. App. 576.


STATEMENT.


The  plaintiffs  are  partners  and  the  defendant
church is a body incorporated under the name of Rector,
Wardens and Vestrymen of the Church of the Redeemer
of the City of St. Louis.   The defendant, Charles A.
Trotman, is president of the vestry and rector of the
church.   Originally some of the vestrymen were made
defendants; but at the outset of the trial a dismissal was
entered against every one except the corporation itself
and the rector.   At the same time the plaintiffs waived
and abandoned any claim for damages resulting from
the defendant's having refused to go on with the con-
struction of the building, which claim was laid in the
following paragraph of the petition:

"And that by reason of the failure of defendant to
carry out the contract with plaintiffs, plaintiffs have
been damaged in the sum of one and one-half (1 1-2) per
cent of one hundred and twenty-three thousand seven
hundred ($123,700) dollars, or the sum of one thousand

eight hundred and fifty-five dollars and fifty cents ($1,855.50)."

The answer of the corporation averred that at the time the written contract between the plaintiffs and it was made, the former were instructed that the plans and drawings to be prepared by the plaintiffs should be such that the costs of the basement of the house to be erected in conformity to them, should not exceed nine thousand dollars and the cost of the entire building not exceed sixty thousand dollars; that contrary to this instruction plaintiffs prepared plans and specifications for a building whose basement would cost not less than twenty-seven thousand dollars and the entire edifice not less than one hundred and twenty-three thousand seven hundred dollars. Said instruction is averred to have been a part of the contract between the church corporation and plaintiffs. Another defense stated is, that the plans, specifications and detailed drawings which plaintiffs were to prepare, should be satisfactory to the defendant corporation; whereas, those prepared were not satisfactory, and, therefore, were refused. The same defense is stated in another count with the additional averment that the reason the plans, specifications and drawings were not satisfactory was the great cost of building in conformity to them. The individual defendants answered by a general denial and plaintiffs' reply to the answer of the corporation was a general denial.

The written contract between the parties was as follows:

"This agreement made this 1st day of December, in the year Nineteen Hundred and Two, by and between Cann & Switzer, architects, parties of the first part (hereinafter designated the architects), and Charles A. Trotman, president of the Vestry Building Committee and Agents of the Church of the Redeemer, parties of the second part (hereinafter called the owners).

"Witnesseth: That the architects in consideration

of the fulfilment of the agreement herein made with the owners agree with said owners as follows:

"Article 1. The architects under the direction and to the satisfaction of owners shall and will provide all plans, specifications and detail drawings as may be necessary and proper for the erection and completion of a church building to be known as The Church of the Redeemer, located on the corner of Euclid and Washington avenues, St. Louis, Missouri. Said architects are to procure from builders and contractors estimates for the construction of said building and by and with the consent of said owners to let contracts for same and to superintend the work and construction of said building and to issue certificates and vouchers for the payment of contractors or others entitled to such payments in accordance with the terms of their respective contracts.

"Article 2. It is hereby mutually agreed between the parties hereto that the sum to be paid by the owners to the architects for said services shall be paid as follows: two and one-half per cent for plans, specifications, details and making contracts, one and one-half per cent for superintending the construction of said building; said commission shall be paid in current funds by the owners to the architects in installments as follows: two and one-half per cent of the cost of foundation when plans are completed and contract for the foundation is let, the balance of commission for plans and specifications to be paid when the entire plans and specifications are finished and contract let for the superstructure. The owners shall pay to the architects in installments as follows: for services for superintending one and one-half per cent of the cost of the building as the work progresses.

"Article 3. The said parties for themselves, their heirs, executors, administrators and assigns do hereby agree to the full performance of the covenants herein contained.

"In witness whereof the parties to these presents have hereunto set their hands and seals the day and year first above written.

THE CHURCH OF THE REDEEMER,

By CHARLES A. TROTMAN,

President of the Vestry.

W. A. CANN,

HENRY SWITZER,

Architects."

The rector of the Church of the Redeemer, Rev. Charles A. Trotman, was the agent of the corporation or vestry in connection with the erection of the contemplated edifice; but the scope of his authority is in dispute. The respondent contends he had no authority except to sign the written contract with the architects; but the appellants say he was given full authority to instruct the architects in regard to the kind of an edifice they should prepare plans and specification for, and that they followed his instructions, he being fully apprised concerning the cost of an edifice to conform to their work. As originally recorded the minute of the authority conferred on Dr. Trotman at the meeting of December first appears below in connection with a quotation from the secretary's testimony.

All the evidence before us was introduced by the plaintiffs, who were denied a submission to the jury at the conclusion of their case. This evidence contains nothing to prove the allegation of the answer that plaintiffs were employed to build a church to cost sixty thousand dollars and its basement nine thousand dollars, except one circumstance: the plaintiff Switzer was a member of the Church of the Redeemer and as he was an architect, when the building of a new church was first under consideration, the rector talked with him about it and, at the rector's request, he prepared a pencil sketch of a building to cost the sums last stated. This was done without compensation, and simply as a favor

to the rector, Switzer having no intention then of engaging to draw plans and specifications for the intended building; in fact he said he did not want the job. Moreover, when this pencil sketch was prepared the cost of building in St. Louis was one-third less than it was when bids were taken on the plans and specifications. Afterwards Switzer and his partner Cann were pressed to prepare plans, drawings and specifications and were assured that their employment would be treated as a business transaction and they would be paid for their work. With this assurance they entered into the written contract with the defendant church and gave several months' time to the preparation of the plans in question. That this work was done under the supervision and according to the instructions of the rector, Rev. Charles A. Trotman, and that he understood the building would cost considerably above sixty thousand dollars, there can be no doubt on the evidence before us. Dr. Trotman said he wanted a building which would be a credit to St. Louis and built somewhat after the fashion of Episcopal churches in England. He took one of the architects to the cathedral at the corner of Thirteenth and Locust streets and indicated that he wanted plans for a house like that edifice in a general way. He said he desired a church as good as several other churches in the city, which he designated, and was going to have it regardless of cost. A departure from the original pencil sketch planned by Switzer was selecting "stock brick" as the chief material to be used in the building, which would considerably increase the cost. While Cann and Switzer were at work on the drawings, which were prepared under his eye, so to speak, the rector gave instructions and directed alterations from time to time. One change in the specifications as drawn by them, which was made at his request, was requiring that the brick be laid in Portland cement instead of mortar, a change which would increase the cost of the building from

seven to ten thousand dollars. He cut out a third row of columns called for by the plans as drawn, though thereby the cost of construction would be increased on account of the greater length of the girders required. He also directed some other expensive changes. Cann and Switzer drew their plans and specifications to suit him, and while the work was in progress, and after it was completed, it met his approval. Bids were taken for construction by the architects and the lowest was $123,700. The plans, specifications and drawings were retained by Dr. Trotman and the vestry from six weeks to two months after receiving them, before April 6, 1903, when final action was taken on them. It is in testimony that none of the vestry objected meanwhile to the work of the plaintiffs, but some of them, at least, acquiesced in it, and that two months before the plans were rejected a picture of the perspective of the proposed building was framed and hung on the wall of the vestry room. Dr. Trotman sent word by telephone to Cann that the church was going to cost more than he expected, and later that the erection of the new church would have to be postponed until after the World's Fair was over, on account of the bids running so high and building material being so dear. He informed the plaintiffs that their bill would be paid, but could not be until the vestry had acted on it, directing them to send the bill to the vestry, which was done. On the evening of April 6th, plaintiffs' work was rejected by the vestry as being entirely too expensive for the means of the church. At the meeting of April 6th, the words "or lettings" in the original minutes of the meeting of December first were objected to by one of the vestry and the secretary, Roland Switzer, son of the plaintiff, Henry Switzer, was directed to strike out those words. In other respects the minutes as first recorded were approved; though motions to make other changes in

them were made but seemingly not adopted. We will quote the secretary's record of those motions:

"April 6th, 1903.

"At the regular monthly meeting, called by the rector and held at his residence, No. 3524 Lawton avenue, present The Rector, Messrs. Chapman, Versteeg, Gordon, Eckstromer, Woods, Marshall and Switzer.

"The minutes of the last regular meeting, held December 1st, 1902, were read but not approved. Moved by Mr. Versteeg and seconded by Mr. Chapman that they be corrected as follows: 'That the word and character "and lettings" be erased and that the following words be added to the motion which authorized Mr. Trotman to sign contract with Cann & Switzer.

" 'The gross cost of said church when finished shall not exceed the sum of $60,000 and the basement when finished and under roof shall not cost to exceed the sum of $9.000.'

"The treasurer stated that his statement had not been made out but would be ready to be read at the next vestry meeting.

"Plans, specifications and bids were laid before the vestry, as well as the bill from Cann & Switzer, architects, amounting to $1,500 for plans, specifications, etc. After discussion the following motion was offered by Mr. Marshall:

" 'Moved by Mr. Marshall and seconded by Mr. Eckstromer that the plans and specifications furnished by Cann & Switzer be returned to them; as being entirely too expensive for our means and that Cann & Switzer be discharged from any further duties in the matter.'

"There being no further business, the meeting was, on motion, adjourned.

"ROLAND W. SWITZER, Secretary."

It will be observed that there is no record that the motion to correct the minute of December 1 was sub-

mitted or carried, or that the motion to decline the plans and specifications was carried. We are left to the testimony of Roland Switzer as to what was done on these motions, and the purport of his testimony is that the only change made in the minute of December first was to strike out the words "or lettings," and that the plans and specifications were rejected as calling for too costly a structure. The effect of this testimony is that the proposal to correct the minute of December 1 so that it would read that Dr. Trotman was authorized to sign the contract with Cann and Switzer, but that the gross cost of the church when finished should not exceed $60,000, and the basement when under roof not to exceed the sum of $9,000 was not adopted. After the building provided for by the main plans and specifications had been determined to be too costly for present construction, at the rector's request the plaintiffs prepared other plans and specifications which contemplated a partial erection of the church edifice at first, leaving it in such a state that it could be completed afterwards as originally designed. Bids were taken on these new plans and specifications and it appeared that such a house could be constructed for about thirty-two or thirty-three thousand dollars. Both the architects swore no limitation was put on them at first as to the cost of the proposed edifice and one of them informed Dr. Trotman that it was impossible to forecast the cost of building a house to conform to the plans and specifications they were preparing, on account of its unusual features.

The scope of the oral authority alleged to have been given to Dr. Trotman, depends for proof on the testimony of Roland Switzer, which will be copied as it is important:

"Q. Mr. Switzer, the vestry is the controlling organization of the Church of the Redeemer, is it not? A.

Well, it is a body put there to run the affairs of the church.

"Q. Sir? A. It is a body put there to run the affairs of the church.

"Q. It is the body which does run the affairs of the church? A. Yes, sir.

"Q. The only authority, however, conferred upon Doctor Trotman with reference to this contract was to sign it, was it not? A. What is that?

"Q. The only authority conferred on Dr. Trotman with reference to this contract was to sign it, was it not?

*      *      *      *      *      *      *  .  *

"Q. This is a fact, is it not, Mr. Switzer? A. Put your question again.

"Q. I say the only authority conferred on Doctor Trotman with reference to this matter was to make the contract, was it not; sign that contract? A. To act as an individual for the vestry. He was vested with full power to act for the vestry.

"Q. In signing the contract? A. In signing the contract and all business connected with the church in the minutes of the minute book.

"Q. You mean at this same meeting? A. I think it was that same meeting, yes, sir."

By counsel for defendants (addressing one of the defendants) : "Let's have the minute book, will you, Mr. Gordon?" (Mr. Gordon produces the minute book.)

"Q. I will show you the minute book of this church, page 97, and ask you if that is not the minute book, and is it in your handwriting? (Referring to book marked 'Exhibit B.') A. Yes, sir, that's my handwriting.

"Q. That's your minutes of the meeting which authorized Doctor Trotman to sign this contract, is it not? A. Yes, sir.

"Q. What does it say?"

By counsel for plaintiffs: "I object to that. You can read the minute itself."

By counsel for defendants: "I offer in evidence said minutes of December 1st, 1902, said page of said minute book being in words and figures as follows."

Counsel for defendants then read from said minute book as follows:

"Moved by Mr. Chapman and seconded by Versteeg, that Mr. Trotman as president of the vestry, be authorized to sign the contract drawn up by Cann & Switzer, architects, for plans and specifications and lettings necessary for erection of church on Euclid and Washington avenues. Motion carried.' You wrote that? A. Yes, sir.

"Q. That's what transpired, is it? A. That's what transpired, yes, sir.

"Q. Now, will you state to the gentlemen of the jury what authority, if any, you gave to anybody to represent the vestry in this matter outside of these minutes?"

By counsel for defendant: "The question should be a little more specific if he intends to develop something not shown by the records. He should ask what was said and done."

By the court: "You ask the witness practically for a conclusion.

"Q. Well, state to the jury whether anybody—"

By the court (interrupting): "Let him state what was said to Dr. Trotman by the vestry with reference to this matter.

"Q. State what, if anything, was said by the vestry to Dr. Trotman with reference to this matter—the matter of superintending the plans and specifications and the erection of this church? A. Well, Dr. Trotman was told to sign up the contract with the architects and to go ahead in the—in that sense—with the building of the church."

\* \* \* \* \* \* \* \*

By the court: "Was anything else done at this meeting besides what is reported in that book, by the vestry as a body? A. No, sir; nothing much outside of that, only that he was given the power to go on with the church as he saw fit.

"Q. Was there a motion made to that effect by anybody? A. No, sir; I don't think there was."

By counsel for defendants: "There was not, you say? A. No, sir."

\* \* \* \* \* \* \* \*

By counsel for plaintiffs: "I desire to offer to prove by this witness that at this meeting, held on December 1, 1902, of the board of vestry of the defendant church, that it was stated by the members of said board then and there present to Dr. Trotman that he should go ahead after signing the contract, and that the matter of the cost of this church and changes in the plan, etc., was entirely in his hands and that they authorized him as the agent of said board to represent them, conferred upon him full authority to do as he pleased in negotiating with the architects about the erection of this building."

By the court: "Well, now, go ahead and prove your offer.

"Q. Now, the court says I may proceed. I will ask you now to state whether or not such an arrangement was made?

\* \* \* \* \* \* \* \*

"Q. Well, I will ask what did happen at that meeting; tell all that did happen there with respect to this matter that I have just referred to? A. Well, I can't remember anybody's conversation. As I say, there was nothing legal done after this. Minutes were written, and, oh, I think we were all under the impression—"

\* \* \* \* \* \* \* \*

"Q. State the substance. If you can't remember exactly the language used, state the substance of it, as near as you remember it."

Objected to.

By the court: "Was anything done by Mr. Switzer at that meeting—pardon me asking the witness this question—was anything done there at that meeting of the board, as a board, after the adoption of this resolution authorizing Dr. Trotman to sign that contract? A. No, sir."

By the court: "I sustain the objection for the present."

To which ruling of the court plaintiffs, by their counsel, then duly excepted.

"Q. I will ask you whether or not this matter you refer to occurred prior to the adjournment of that board or subsequent to the adjournment? A. I didn't catch that.

"Q. State whether or not this understanding or impression you had grew out of something that occurred prior to the adjournment of the board that evening or after the board adjourned? A. It was after the board adjourned."

By counsel for plaintiff: "Now, then, I offer to show that after the board adjourned by mutual agreement among the parties, the officers of this board—(discontinues)—that Dr. Chapman was authorized to represent them as their agent.

By the court: "Well, proceed."

"Q. Now, then, state what was done about this after the adjournment of the board, or what was said about it by the officers then and there present to Dr. Chapman—to Dr. Trotman? A. Well, as near as I can remember, Dr. Trotman was told to go ahead with it—"

Objected to.

By the court: "Have you any recollection of any

particular member of the vestry having a talk with Dr. Trotman after the adjournment of the board? A. No, sir." ·

By the court: "Have you any recollection that the matter was discussed by some members of the board after the adjournment? A. Yes, sir; it was discussed, and I left with the impression that Dr. Trotman was—"

By counsel for defendant (interrupting) : "Just a moment. I would rather you would not state the impressions."

By the court: "It is not a question of your impressions, or what impressions you gathered from what any one or more of the members of the board after adjournment may have said.

"A. Well, I couldn't repeat that."

We have omitted from the foregoing excerpt of the secretary's testimony most of the frequent colloquies and arguments with which the witness was interrupted.

The evidence has been presented in the aspect most favorable to the plaintiffs, as they were nonsuited and are, therefore, entitled to the benefit of every inference that can be deduced in support of their case. There was some testimony to show that one of the plaintiffs, Switzer, knew all the time that the congregation would be unable to build a house in conformity to his plans.

GOODE, J. (after stating the facts). —The circuit court held the plaintiffs' action was on the contract between the parties and not *quantum meruit,* but the counsel for both sides say the form of the action in that regard is immaterial to a decision on the appeal. It is insisted for the plaintiffs, that whatever the form of the action may be, the evidence introduced made a case for the jury; and for the defendant that no case was made, either on the contract or *quantum meruit.* It may be true, that this question is not important here; but if the cause is tried again it would be important then in this respect, if no other: if the suit is on the contract, the

amount of a possible recovery by the plaintiffs, since their disclaimer of the remuneration they would have earned as superintendents, would be, not the reasonable value of the service they rendered in drawing the plans and specifications, but the stipulated price of that service; whereas, if the action is *quantum meruit,* they can only recover the reasonable value of the service, not to exceed the stipulated price.     Ehrlich v. Ins. Co., 88 Mo. 249.     A party who has fallen short of fully performing his obligation under a contract, may be entitled to maintain an action *quantum meruit* for several kinds of substantial benefit resulting to the other party from partial performance; such as an improvement of the other's property, the sale and delivery of goods to him, or work done for him. A benefit of that sort, if it is not a perfect compliance with what was stipulated for, cannot be accepted and utilized without making reasonable compensation.     Yeats v. Ballentine, 56 Mo. 530.     Because something of value is received and retained by one party to the contract, the law will not leave the other, who has contributed the valuable thing, wholly without remedy on account of an imperfect discharge of his duty. It will deny him a remedy on a contract whose terms he failed to observe, but will give him as much compensation as is fairly merited by his performance as far as it went, to be measured by the reasonable value of the benefit accruing from it.     In the contingencies stated, the suing party is in fault.     But one may have the remedy *quantum meruit,* when his adversary, and not he, prevents full performance of a contract and is, therefore, in fault. If a party is prevented from completing his part of an agreement by the obligee, he may, if he chooses, treat the contract as abandoned and sue for what he had done already toward performance, instead of seeking damages on the contract for breach.     Ream v. Watkins, 27 Mo. 516; Ehrlich v. Ins. Co., 88 Mo. 249.     We think the only way in which a right to sue *quantum meruit* could have

arisen in plaintiffs' favor, was by the church corporation refusing to go on with the building after satisfactory plans had been submitted by the plaintiffs, thereby preventing the plaintiffs from superintending the construction of the proposed edifice; which full performance of their obligation would otherwise have required them to do. If this happened, plaintiffs had the privilege of waiving damages for the breach and suing for the reasonable value of their work. Did they do this, or sue for an alleged breach? The fact that the terms of the contract are stated in the petition is not determinative of this question one way or the other; for a pleader may state a contract and its breach by the defendant, and nevertheless state a cause of action *quantum meruit,* if he avers a waiver of damages for the breach and asks only for the reasonable value of what the plaintiff had done toward performance before the defendant stopped him. Cases supra. The petition in this action, as originally filed, manifested no intention on the part of the plaintiffs to waive any damages to which they might be entitled on account of the defendant's assumed breach; but, instead, distinctly asked judgment, not only for the value of the work actually done, at the contract price, but also for the remuneration they would have earned at the agreed rate, by superintending the construction of the building if the contract had been carried out. A petition in that form and asking to recover compensation which would have been earned for future services, cannot be construed to state a cause of action *quantum meruit.* But the nature of plaintiff's proceeding was changed before the trial began, by their abandonment of any claim for what they would have earned by superintending the building. This waiver in open court of the relief asked by that part of the petition which counted on possible future earnings, left plaintiffs suing for nothing but the value of work already done; and as the reasonable value of that work was averred, though at the con-

tract price, the cause could then be regarded as *quantum meruit*. The disclaimer in regard to future earnings was made in the form of an abandonment of the claim for damages contained in the paragraph of the petition we have quoted, and its effect on the trial was equivalent to an amendment of that pleading.

Plaintiffs were defeated because, in the opinion of the learned circuit judge, their evidence indisputably proved the plans and specifications were not satisfactory to the defendant corporation, which fact precluded a recovery against it; while there was no showing of liability on the part of the defendant Trotman. As to the latter the ruling was unquestionably correct. Not a line of evidence is before us to show either that he made a contract with the plaintiffs or that they rendered him a personal service of value. They were working for the Church of the Redeemer, not its rector. Whether the action is on the contract or *quantum meruit*, it is obvious that he is not liable. The only conceivable theory on which he could be, is for exaggerating his authority as agent of the church, to the detriment of the plaintiffs; but nothing of the kind is charged. The plans were rejected as unsatisfactory by the vestry; which, so far as there is any proof bearing on the subject, is shown to be the controlling body of the incorporated church; its board of directors or trustees in whom is vested the management of the temporal affairs of the corporation. No by-laws of the corporation were put in evidence, nor any rules of the Episcopal denomination respecting the control of the church property; but there was oral testimony that the management of the business of a particular congregation of that sect, is committed to its vestry; and we shall assume this to be true in considering the case.

The reason, and the only reason, given why the plans, drawings and specifications submitted by the plaintiffs were unsatisfactory, was that they were entirely too expensive for the means of the church; which

meant, of course, that they called for too expensive a building. This reason was as good as any if the vestry's action was taken in good faith and not arbitrarily, or from some extraneous motive, when, in truth, the plans were satisfactory. The conclusion derived from the answer of the Church is that its objection to the plans and main defense, is that plaintiffs disregarded instructions given to them as to how costly a house plans should be prepared for—that their instructions were to draw plans for a house whose cost, both as to the basement and the entire structure, should not exceed a designated maximum, and that instead of doing this, plaintiffs prepared plans for a much more expensive building. Proof that explicit instructions were given and disregarded would be a complete defense; but practically nothing of that kind was shown; certainly nothing conclusive. Therefore, the circuit court cannot be justified in ordering a verdict for the defendant church on the ground that the evidence left room for no defense save that plaintiffs had materially departed from their instructions. But without proof that instructions were given and ignored, plaintiffs were not entitled to recover if the evidence showed beyond question their work was declined in good faith as unsatisfactory because the edifice called for would be too expensive. If no information was communicated to the plaintiffs regarding the expense the vestry was willing to incur in erecting the proposed house, and plaintiffs prepared plans without asking any information on the point, they took the risk of having their work rejected, if, in the opinion of the vestry, too great an outlay of money would be required in following the plans. To avoid that risk it was incumbent on them to get advice from the proper source in advance. It follows that the rejection of the plans, in good faith, is conclusive as against plaintiffs' right to recover, except in one of the several contingencies stated below.

Though the written contract says nothing about the price of the contemplated edifice, it cannot be construed as authority to the plaintiffs to draw plans for a house of any cost they saw fit. We find this stipulation in the contract: "The architects under the direction and to the satisfaction of the owners, shall and will provide plans, specifications, detailed drawings, etc." That term looked for directions to be given to the architects regarding the kind of house desired. The vestry had no building committee and the mention of one in the written instrument was a mistake and is to be disregarded. The owner was the corporation itself, and the directions would have to be given by its administrative body, the vestry, or some agent authorized by the vestry. Therefore, the contract called for directions to the architects by the vestry, and for plans to be prepared by the architects to the satisfaction of the vestry; and to exclude the defense that the plans actually prepared were not satisfactory because they would entail too much expense, it must appear that the vestry authorized those plans, either directly by its own action, or through an agent whose act was originally authorized or subsequently ratified, or that it accepted the plans with knowledge of the expensive character of the house designed. To authorize the plaintiffs to go to the jury there must have been some evidence tending to prove one or the other of those facts, or else that the refusal of the work was from an ulterior motive.

That the vestry itself instructed plaintiffs to prepare such plans as were submitted, is not asserted. Neither do we think any showing was made that the plans and specifications were accepted by the vestry. It is true they were in the hands of that body, or of a member of it, probably Dr. Trotman for five or six weeks; but naturally they would be under examination for some time. So far as is disclosed, no use was made of them by the church, and they were rejected at the first meeting

of the vestry after submission, and returned to the plaintiffs. Nothing substantial was proved to show an acceptance or justify a finding in plaintiffs' favor on that theory. Our attention is called to the circumstance that a picture of the perspective of the proposed building was admired and framed by the vestry, or one of them; but that is a trifle. It does not appear that the Church officials, when they examined the picture, had any knowledge of what it would cost to build such a house.

The evidence goes to show plaintiffs' work was done under the supervision and according to the instruction and wishes of the rector of the church, and it is contended that he had authority, express or implied, to give directions; or, if he did not, that his conduct in that regard was ratified by the vestry. A proposition much pressed by plaintiffs' counsel is that as Dr. Trotman was president of the vestry and rector of the church, instructions regarding the preparation of plans and specifications for the contemplated edifice was a power incidental to his office and which the law will imply as existing in him, unless his authority is shown to have been restricted. For that matter, the contract itself shows the plans were to be drawn to the satisfaction of the owners of the church (the vestry) ; that the agreement was with that body and was signed by the rector as president of it; and this would restrict any authority in the rector which the law might otherwise imply from his position as president. The vestry reserved control over the plans. But no such power as is contended for is implied by the law to belong to the rector of a church or president of its vestry. As said before, we are not enlightened by the evidence concerning the internal regulations of Episcopal churches or their rules of government, or whether there are rules. Plaintiffs' counsel seek to liken the office of president of the vestry to that of a business corporation, and invoke the rule of law that presidents of

corporations may, without express authority, do any act necessary to carry on the business of their companies. Ferguson & Wheeler v. Venice Trans. Co., 79 Mo. App. 352; Degnan v. Thoroughman, 88 Mo. App. 62. It is true the public in dealing with the president of a corporation may, in the absence of notice to the contrary, presume that he is clothed with authority to do such acts as are customarily done by him or by the presidents of similar corporations; but this record contains no proof concerning the usual functions of the presidents of Episcopal vestries, nor any proof that the rector of this particular church had been permitted to have such control of its business affairs as would justify the plaintiffs in assuming that he had authority to instruct regarding the plans to be drawn.    Therefore, we cannot deduce the requisite authority in Dr. Trotman, either from the powers usually exercised by vestry presidents or the powers previously exercised by him with the consent of his vestry. Looking at the matter without any evidence to throw light on it, we must say it seems extremely improbable that the pastors of churches or the presidents of boards of church trustees, usually control the building of church edifices or dictate how much they shall cost. That function is peculiarly within the province of the governing body of a church, which must take into consideration the means available and the needs of the congregation.    That the law does not imply any such power in a pastor or the president of a board of church trustees, from the position he holds, but that such a duty must be performed by the trustees themselves or their appointed agents, has been decided several times by respectable courts.    Constant v. Rector, etc., 4 Daly. 306; Bank v. Church, 109 N. Y. 512; Church v. Gavalon, 82 Ill. 170; Katron v. Universalist Soc., 46 Iowa 106; Packard v. Church, 10 Metc. 427.

We have quoted in our statement the testimony relied on to show authority was actually conferred on the

rector.    It is oral and consists exclusively of the testimony of Roland Switzer, the secretary of the vestry. The resolution passed by the board December 1, 1902, went no further than to authorize Dr. Trotman to sign the written contract with the plaintiffs.    But the law does not require the appointment of an agent of a corporation to be by resolution or formal vote of the directors or trustees, nor that the powers conferred on him shall be thus delegated.    He may be appointed informally without vote or resolution and clothed with authority in the same manner.    Jones v. Williams, 139 Mo.1; Bank v. Gilstrap, 45 Mo. 419.    Such action must be taken by the directors when assembled as a board, and cannot legally result from the assent of the majority given singly when not thus assembled.    Hill v. Mining Co., 119 Mo. 9.    The reason of this rule, as we understand it, is that the directors, trustees, or the governing body of a corporation, whatever its designation, should act on matters after deliberation, and may not bind the corporation by individual assents without opportunity for discussion or interchange of views. The testimony of the secretary on the point of oral authority to the rector to supervise the preparation of plans for the new church, was given disconnectedly and with many interruptions from the defendant's counsel and arguments on objections.    We disapprove of this mode of receiving testimony; for it tends to confuse a jury and prevent them from grasping the true effect of what a witness says. An attentive scrutiny of the testimony in question has convinced us that it does not warrant the inference of any oral authority to the rector.    While the witness said at first that Dr. Trotman was given full power to act for the vestry in all business connected with the building of the new church, and to conduct it as he saw fit, on perusing his entire statement on the subject it is plain that he gathered this impression from isolated remarks made by vestrymen, and probably after the adjournment

of the meeting of December 1. There is nothing in his testimony from which the conclusion can be drawn fairly that a majority of the vestry, even by informal action, agreed to clothe Dr. Trotman with full power over the architects, either while the board was in session, or when it was not. Barcus v. Road Co., 26 Mo. 102; Williams v. Female College, 29 Mo. 250. If any action can be taken by corporate directors or trustees when not in session, probably it could only be done by their unanimous consent. But this proposition and its provisos need not trouble us, as there is no showing that a majority of the vestry assented at any time to the rector's directing the architects regarding the plans.

Nothing was disclosed tending to prove the vestrymen were aware that the rector was having plans prepared for a building to cost more than was desired and, with such information, permitted plaintiffs to go on with the work without protest. Nor was any other conduct of the vestrymen shown from which ratification of the rector's acts by the vestry can be inferred, to estop it from disclaiming responsibility for those acts. It has thus been seen that there was evidence neither of actual authority in the rector to give instructions regarding the plaintiffs' work nor of implied authority by virtue of his office, nor of ratification of his unauthorized acts by the vestry.

The question of whether there was evidence for the jury to consider on the issue of the vestry's good faith in rejecting the plans remains. Though these were to be prepared to the satisfaction of that body, and though it might reject them if unsatisfactory, either in regard to the style of the building called for, or its expense, it could not reject them arbitrarily or from a motive wholly unconnected with the plans themselves. There is evidence in the record which has some tendency to induce a belief that the plans were rejected, not because the building provided for was too

expensive, at the usual prices of labor and material, to suit the vestry, but because the cost of building houses in St. Louis at the time the bids were taken, was deemed excessive. That is to say, from the evidence the inference is legitimate that the house called for by the plans was such as the vestrymen would be willing to erect when it could be done for a reasonable price; but that, in their opinion, the prices then prevailing were unreasonable and would fall; and therefore, it was wise to postpone building until later. This was no just reason for rejecting the plaintiffs' plans. If the cost of building was higher than the vestrymen wished to incur at that time, they should have taken this into consideration, and not ordered plans and specifications. Or, if they ordered plans without informing themselves of the prices of labor and material, they were in fault and not the plaintiffs. This means that plaintiffs' plans could be rejected only if the vestry was dissatisfied with them and not merely with the cost of building at that time. As well say that if a man ordered plans from an architect, intending to build, he might decline to receive and pay for them because a subsequent change in his financial affairs made it impracticable for him to build. A stipulation in a contract that a party for whom work is to be done or to whom an article is to be furnished, may reject the work or the article unless it is satisfactory to him, gives that party the right to reject it as unsatisfactory in any respect, if he acts in good faith; but does not give him the right to reject it arbitrarily; and the words "good faith" and "arbitrarily" we take to mean that the rejecting party must find some substantial fault in the work or the article itself, which renders it unsatisfactory, and not merely a reason for changing his mind regarding the project he had in view, and for which he ordered the work or the article. That such a term in a contract requires good faith and a just motive in the party to be pleased in declining the stipulated service, is the law. Dinsmore v. Livingston County, 60

Mo. 241; Williams v. Railroad, 112 Mo. 463, 20 S. W. 631, s. c., 153 Mo. 487, 54 S. W. 689; Blaine v. Knapp & Co., 140 Mo. 241, 41 S. W. 787; Kinnerk v. Base Ball Club, 92 Mo. App. 669; Eldridge v. Fuhr, 59 Mo. App. 44. The circumstances which excite doubt as to the good faith of some of the vestrymen, are that the plaintiffs, instead of being notified that their plans were unsatisfactory, were notified by the rector that the vestry had decided to postpone building until after the World's Fair closed. It was also in proof that two of the vestrymen, the rector and the secretary, knew all the time the cost of the house for which plaintiffs were preparing plans. Moreover, the rector promised plaintiffs they should be paid for their work, and there was an effort made to change the minutes of the meeting at which the plans were ordered. The difficulty confronting us in holding there was evidence for the jury on the question of the good faith of the vestry in rejecting the plans submitted by plaintiffs is that no testimony was adduced to connect a majority of the vestrymen with the dubious circumstances. A wide latitude was accorded to the owners of the proposed building (that is, the vestry), in approving or rejecting the plans and they might decline them as unsatisfactory because of the outlay of money required to build in conformity to them. This was the ground assigned for the vestry's action and must be accepted as the true ground unless there are facts tending to establish that a different motive influenced a majority of that body. There is no proof that the rector was authorized to notify the plaintiffs that the erection of the church had been deferred until after the World's Fair, or that the plaintiffs would be paid for their work. The effort to change the minutes, so as to prejudice the plaintiffs by a false recital, failed. An impression is produced by the evidence that the plaintiffs' claim possesses equity. But they relied too exclusively on the rector after they had bound themselves to satisfy, not him, but the vestry. Though it is a fair inference that some

Duncan v. Railroad.

members of that body were solicitous to evade paying plaintiffs for their work and willing to aid that purpose by a questionable expedient, plainly we cannot impugn the motive of the members who refused to join in falsifying the minutes because of the attempt of others.   The rectitude of the majority ought not to be impeached by the improper conduct of a minority.   Neither can we bind the vestry by the statements and acts of the rector, in default of proof, direct or inferential, that he acted by authority.   To make out a case of bad faith it was incumbent on the plaintiffs to introduce evidence either positive or circumstantial, to show a majority of the vestrymen acted from a wrong motive.   In our opinion this was not done; and in the absence of such proof, the presumption obtains that the plans were rejected in good faith because they were not satisfactory as, according to the contract, they were bound to be to entitle them to acceptance.   The judgment is, therefore, affirmed.

All concur.