**R. Brian HALL and Thomas H. Stahl, Respondents,**

v.

**W.L. BRADY INVESTMENTS, INC., Appellant.**

**No. WD# 35127.**

Missouri Court of Appeals, Western District.

Oct. 30, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Dec. 26, 1984.

Application to Transfer Denied Feb. 26, 1985.

William C. Partin, Matthew Partin, Partin, Partin & Barry, Kansas City, for appellant.

John C. Dods, Joanne T. Wagner, Shook, Hardy & Bacon, Kansas City, for respondents.

Before CLARK, P.J., and DIXON and LOWENSTEIN, JJ.

CLARK, Presiding Judge.

This is a suit by respondents for breach of a contract to provide real estate construction loan financing. A jury awarded respondents verdicts against appellant, W.L. Brady Investments, Inc., and co-defendant Capitol Life Insurance Company in amounts totaling $166,600.00. After judgment, respondents settled with Capitol and Brady appeals. The issues Brady presents charge trial error in the exclusion of certain evidence tendered by Brady, the content of jury instructions, the submissibility

of the claim for punitive damages, and the amount of the verdicts. The judgment is affirmed in part and reversed in part.

The transaction between respondents and Brady originated when respondents contacted Brady as a possible source of financing for an office building respondents planned to construct. The need was for a permanent, long term loan to replace a temporary construction loan with which the project was to be initially funded. Brady is in the business of a loan broker, that is, it acts as an intermediary between borrowers and lenders. Capitol Life Insurance Company was one of Brady's contacts and a source of funds for mortgage loans.

In furtherance of the project, Brady prepared a "loan package" on behalf of respondents and sought to interest lenders in committing funds. The practice in such transactions is for the lender to make an advance commitment for a specified period to issue the loan on completion of construction, thereby assuring the borrower that the funds will be available when needed. Brady solicited such a commitment from Capitol as to respondents' project and received a favorable response. At this stage of negotiations, respondents were not aware of the identity of Capitol as the ultimate lender, but dealt entirely with Brady.

A commitment to issue a loan is the document on which the loan is ultimately concluded in such cases and sets the terms to be met by the borrower. The commitment here was issued to respondents by Brady and constitutes the contract which respondents' suit claims was breached. The obligation assumed by Brady, however, was in fact underwritten to Brady by Capitol because Brady does not have the resources nor does it act in practical terms except as a conduit for placing investors' funds. Because of this relationship, the actual terms of the commitment were set by Capitol and were merely repeated by Brady in its commitment letter to respondents.

The commitment by Capitol to Brady was by letter dated August 9, 1979 in which Capitol agreed to purchase respondents' loan, negotiated by Brady as intermediary. The various conditions specified by Capitol included two requirements which are the focus of this suit. The language in Capitol's letter to Brady and in Brady's letter to respondents is identical and is extracted from the documents as follows:

"11. The borrower is to deliver to this Company the sum of $14,600 as part of the consideration for the issuance of this commitment and for this Company's obligation to lend the money, but this sum shall be returned to the borrower if the loan is consummated according to the terms of this commitment letter during the commitment period or any extension thereof.

12. Upon satisfactory completion of the improvements, we will fund $292,000. We will withhold the balance of the loan proceeds until such time as gross annual rents, under leases acceptable to Capitol Life, are equal to or in excess of $52,500. Upon disbursement of the initial loan proceeds, the borrower will have ninety days in which to meet the leasing requirement to provide for the funding of the remaining loan proceeds. If the leasing requirement is not met during the ninety day period, the loan shall remain in the amount of the initial disbursement with appropriate adjustment in the monthly installments."

The date of the Brady commitment letter to respondents was August 14, 1979 and the terms were accepted by them on August 24, 1979. At that time, respondents paid Brady the commitment fee of $14,600 described in paragraph 11 above. The commitment fee was, in turn, remitted by Brady to Capitol in performance of the comparable obligation of Brady under the commitment extended to it by Capitol.

With permanent financing assured, respondents proceeded with construction of the office building. It was respondents' plan to occupy a portion of the building for their own offices and to rent the remainder to tenants. By March of 1980, construction had progressed to the point that respon-

dents moved their office and relocated in the new structure. Anticipated rental of the other space did not immediately materialize and the leases contemplated by paragraph 12 of the commitment agreement had not been obtained. The loan funds were therefore limited to $292,000, as the agreement provided. The completion of construction of the space in the building proposed for tenant occupancy was a source of dispute at the loan closing, thereafter aborted as described below.

The evidence in the case suggests that respondents decided to defer some interior finishing of the rental space areas until leases were procured. Brady earlier objected to this state of incompletion, but the parties nevertheless met to close the loan on April 30, 1980, the last available day before the Brady commitment expired on May 1. Some discussion ensued as to the incompleted items and agreement was reached to escrow $5000 of the loan proceeds for carpet and ceiling tile not yet installed. Brady also appears to have retained reservations concerning the extent of other finishing work more recently done since the last prior inspection. The closing statement bore the notation, "This Closing Is Subject To Final Inspection Of Stage Of Completion Of Property By Mortgagee." In all other respects, the loan closing on April 30, 1980 was routine and the documents necessary to conclude the loan were executed by all required parties.

On May 1, 1980, a representative of Brady made a personal inspection of the office building and formed a judgment that the escrowed funds were insufficient to complete work on the building and that the condition of the commitment, that the improvements be satisfactorily completed, had not been met. Respondents were notified by Brady on May 5, 1980 that the loan would not be funded. The loan papers were not recorded and the commitment fee of $14,600 was declared forfeited.

The refusal by Brady to close the loan and the concurrent expiration of the commitment agreement obligated respondents to seek other financing under the circum-

stances of an obligation to satisfy the maturing construction loan. Upon inquiry, respondents learned that the loan market had changed since August, 1979 and interest rates had escalated. When finally obtained, the replacement loan bore an interest rate 3% higher than the Brady committed rate and the callable term was five years shorter.

For damages resulting from Brady's alleged breach of the loan commitment agreement, respondents initially pursued a seven count petition which was distilled as trial progressed. The ultimate submission to the jury was in two branches. In the first, the cause of action was breach of contract upon the claim that Brady violated its letter commitment to fund the mortgage loan. Damages sought were those attributable to the subsequent rate differential and the expenses associated with the replacement loan. The lost commitment fee paid Brady was expressly excluded from the jury's consideration in calculating breach of contract damages. In the second branch, the cause of action was in tort against Brady and Capitol for conversion of the $14,600 commitment fee. The jury was instructed that a verdict for plaintiffs on the tort count would require an award of actual damages of $14,600. The second branch of the submission also included a claim for punitive damages to be awarded if the jury found the conversion of the fee to have been willful, wanton or malicious. The jury did so find returning verdicts for both actual and punitive damages.

## I.

More than a single point of Brady's appeal turns on its contention that the trial court erred in submitting to the jury as a separate claim that count of respondents' petition asking recovery of the commitment fee paid Brady and punitive damages. This point will be considered first.

Brady contends respondents impermissibly split their cause of action for breach of contract by the artificial creation of a tort claim to be used as a vehicle for submission of punitive damages. They argue that re-

spondents had only one cause of action and that the unrefunded commitment fee was at most an item of damages recoverable for breach of contract. Respondents argue, to the contrary, that they were entitled to submit different theories of recovery for different elements of their damage so long as there was no dual recovery.

In considering this aspect of the case, it is first appropriate to observe that respondents were not necessarily precluded from asserting a cause of action in tort merely because the gravamen of their complaint was breach of contract. While the general rule is that punitive damages are not recoverable for breach of contract, an exception to the rule allows punitive damages when plaintiff alleges and proves an independent and willful tort founded on breach of contract. *Stamps v. Southwestern Bell Telephone*, 667 S.W.2d 12 (Mo.App.1984). Respondents here sued both in contract and in tort for separate damages, obviously for the purpose of seeking punitive damages. That choice is not necessarily flawed merely because all damages originated in breach of the commitment agreement.

█ Brady gathers its various contentions regarding submissibility of the tort count under the single umbrella assertion that separate counts could not be pursued in this case because to do so constituted a prohibited "splitting a cause of action." The point, however, actually involves distinct and different concepts each of which is exemplified by a case Brady cites. Separate discussion will clarify the difference and explain the basis upon which the point is sustained. The case of *Eugene Alper Construction Company, Inc. v. Joe Garavelli's*, 655 S.W.2d 132 (Mo.App.1983) is an example of the usual fact situation of splitting a cause of action. The rule against splitting prohibits bringing separate suits for different elements of damage arising out of the same cause of action between the same parties. *Lee v. Guettler*, 391 S.W.2d 311 (Mo.1965). The purpose of the rule is that all claims arising out of the same subject matter should be determined in one action. *Cantrell v. City of Caruthersville*, 267 S.W.2d 646 (Mo. 1954).

In *Alper, supra*, plaintiff first sued Garavelli's, a corporation, for an account balance due on a construction contract. A judgment was entered for Alper and that judgment matured to finality. Subsequently, the judgment creditor, Alper, learned that Garavelli's assets had been sold at a purported auction to the directors and officers of the corporation leaving the latter execution proof. Alper then commenced a second suit against Garavelli's and the individual directors and officers to collect the account debt. The gist of the disputed count in the suit was that Alper had been induced by fraudulent misrepresentations as to the corporation's solvency to provide goods and services and, on that ground, a recovery was sought against the individuals for the balance due on the contract. The opinion held the second suit to have been barred by the previous judgment because the contract claim was a single cause determinable as to all elements in one suit. Alper was not entitled to split out its claim against the officers and directors but was required to have asserted that claim, if at all, in the original action.

This aspect of the splitting rule plainly has no application to the subject case in which respondents asserted all claims against all parties arising out of the loan commitment agreement in the single action. To this extent, respondents' suit complied with rather than violated the rule.

A different concept, however, is illustrated by the second case cited by Brady, *Chuning v. Calvert*, 452 S.W.2d 580 (Mo. App.1970). There Chuning, a fireman, was injured in an automobile accident while responding to a fire call. He sued Calvert, the driver of the other vehicle. Damages were claimed for personal injuries, medical expenses and lost wages. On motion by the city, Chuning's employer, it was permitted to intervene in the suit and assert on its own account a claim against Calvert for wages and medical expenses the city had incurred on Chuning's behalf. The opinion held the intervention of the city to have

been improperly permitted because that constituted an impermissible splitting of Chuning's personal injury claim. The reason the claim could not be divided and advanced separately, even in the same suit, was because public policy prohibits the assignment of any part of a personal injury claim. The city therefore had no cause of action to assert.

On similar ground, respondents were not entitled here to pursue a tort claim against Brady and Capitol for conversion of the commitment fee because, when split off and asserted under a different theory of liability, the damages respondents sustained in the loss of the fee were not recoverable under the theory adopted. In short, and despite the entitlement of respondents to recover the fee as an element of damages sustained in a cause of action for breach of contract, no case was made in tort for conversion.

 Conversion is a cause of action generated where funds given into the custody of another for a specific purpose are diverted by the holder for other than such specified purpose. *Dillard v. Payne*, 615 S.W.2d 53 (Mo.1981). A general debt does not give rise to a cause of action in conversion. To fall within the exception which distinguishes conversion from an action on a debt, the plaintiff must have delivered funds to the defendant for a specific purpose and the defendant must have diverted them to another and different purpose. *Knight v. M.H. Siegfried Real Estate Inc.*, 647 S.W.2d 811, 817 (Mo.App.1982). The exception requires that there be misappropriation of funds placed in the custody of another for a definite application. *Boyd v. Wimes*, 664 S.W.2d 596, 599 (Mo.App.1984).

 Although respondents here asserted in the applicable count of their petition an entitlement to a return of the commitment fee paid Brady, there was no allegation that the fee was paid over to Brady as a special deposit or for a specific purpose, except in satisfaction of the borrowers' obligation under the commitment agreement, and there was neither allegation nor proof that Brady diverted the funds to another or

different purpose. The agreement entitled Brady to retain the fee if the loan were not closed and obligated it to return the fee if the loan was consummated. By all accounts, the loan was never closed and thus, even under the agreement itself, there was no duty on Brady to refund the particular money received when the commitment agreement was negotiated. Instead, respondents' claim was in damages for loss of the amount of the fee, not because Brady converted money entrusted to it for a particular purpose, but because Brady breached the commitment agreement by refusing to close the loan after respondents had performed, as they contended, all applicable loan conditions.

Under the facts of this case, respondents had no cause of action in tort and their attempt to split the claim into one for breach of contract and one for tort fails as to the latter because they failed to establish a cause upon which relief could be granted. Of necessity, the exclusion of the commitment fee as an element of damage to be considered for allowance by the jury under the breach of contract count prevents any recovery by respondents as to this item. The trial court erred in submitting the tort count to the jury and the award of $14,600 actual damages and $50,000 punitive damages returned against Brady must be reversed.

Additional subsidiary points raised by Brady are rendered moot by the foregoing disposition of the conversion claim. The first of these is Brady's contention that the trial court denied it an opportunity to disprove respondents' assertion that Brady did not close respondents' loan because of a plan between Brady and Capitol to get out of the loan business in a market of rising interest rates. Respondents' case in support of punitive damages, allowable only under the tort count, turned in part on the insinuation that Brady and Capitol were seeking to void the loan commitment to respondents, not on the merits of respondents' performance, but to avoid making a loan at rates substantially lower than could be obtained in the market at the scheduled

closing date. Brady countered with proffered evidence that other loans, similar in terms to the commitment to respondents, had been closed by Brady and Capitol during the same time period.

The evidence both from respondents and from Brady as to motivation was irrelevant to any issue in the breach of contract aspect of the case where the decision turned on whether or not respondents had satisfactorily completed the improvements as the commitment agreement required. That same evidence was, conversely, of considerable significance in determining an award of punitive damages under the tort count which involved proof of willful, wanton or malicious acts. Because the tort count and any punitive damage award are no longer in the case by reason of the disposition discussed in the first portion of this opinion, it necessarily follows that receipt or exclusion of the motivation evidence is now a moot point. We do not perceive Brady to argue otherwise and we therefore express no opinion as to the ruling by the trial court on this evidence.

In two additional points, Brady contends the award of $50,000 punitive damages was excessive and that the court's instruction to the jury submitting punitive damages was in error. Both points are obviously mooted by the prior disposition of the first claim of error.

## II.

■ The next point on appeal relates to the provision of the loan commitment agreement which conditioned closing of the loan on satisfactory completion of the improvements. Brady judged the improvements to have been unfinished in part and, on this account, construed itself and Capitol to be released from the agreement. Thus, it was critical to the case for the jury to decide whether construction had or had not been completed within the framework of the contract.

The evidence was undisputed that some work on the building remained unfinished.

The physical details of the remaining construction were not in serious question but the effect upon fulfillment of the "satisfaction" clause was. The problem was how the language of the contract was to be construed, a matter of law, and how the jury was to be instructed on the subject of what stage of completion was or was not to be held satisfactory under the commitment agreement.

The instruction settled upon by the trial court, for which there is no applicable MAI, informed the jury that satisfactory completion meant, "completed in a manner and to an extent which a reasonable lender would regard as satisfactory under the same or similar circumstances." Brady contends the instruction was in error and that the contract language gives to it the right of determination, in good faith, whether respondents' performance was satisfactory. The respective contentions of the parties focus on two alternate approaches to a test for reasonableness of dissatisfaction with performance under a contract which conditions obligation of the promisor on satisfaction. The first is that advocated by Brady and leaves the decision to the personal judgment of the promisor qualified by a requirement of good faith and substantive basis. The second is that advocated by respondents and adopted by the trial court and usually denominated the reasonable man test.

In support of its contention that the instruction given was in error because Brady was denied the opportunity to prevail if its dissatisfaction was based on its own business judgment, Brady cites and relies primarily on three Missouri cases.[1] The most recent of these was decided in 1917 and all are of dubious application to the situation in this case. Factors which distinguish appellant's cited cases are the contract language in each and the subject matter for satisfaction. As to the former, if the contract specifies satisfaction to be a matter within the judgment exercise of the promis-

---

1. *Mullally v. Greenwood,* 127 Mo. 138, 29 S.W. 1001 (1895); *Burns v. Reis,* 196 Mo.App. 694, 191 S.W. 1096 (1917); *Cann v. Rector,* 111 Mo. App. 164, 85 S.W. 994 (1905).

or, a circumstance not present in this case, it may well be that the parties have contracted to exclude the reasonable man test. As to the latter, at least one of the cited cases involves a question of taste or aesthetics to which the reasonable man test is inapplicable.

Respondents have cited no authority to counter Brady's argument or to support the theory of the challenged instruction. As a consequence, resolution of the point has necessitated recourse to independent research. No Missouri case has been found which rules the question of what test is applied to determine satisfaction where the contract includes no definition of a standard and where fraudulent conduct is not an element.[2] We therefore address the issue as one of first impression.

Before discussing the rationale and authority supporting the decision that the reasonable man test is applicable in this case, it is appropriate to note that the agreement here, unlike most similar agreements in the reported cases, does not provide that the improvements are to be completed to Brady's satisfaction. The parties have assumed that to be the construction of the document language but nothing in the agreement requires or points to that interpretation. Indeed, it is at least arguable that the provision was intended to require substantial completion, that is, a stage of construction where the building can be put to its intended use even though comparatively minor items remained to be finished. *Southwest Engineering Company v. Reorganized School District R–9*, 434 S.W.2d 743, 751 (Mo.App.1968).

If substantial completion be the object, a purpose compatible with the economic interests of Brady and Capitol, then no argument can be successfully advanced that a reasonable man test is not appropriate. Brady and Capitol were collectively the authors of the agreement which could readily have been drawn to require that construction be completed to Brady's satisfaction.

The failure to include this provision necessarily militates against Brady's argument that satisfactory completion was to be evaluated solely on Brady's good faith business judgment.

Apart from the foregoing, however, and assuming that completion of construction to Brady's satisfaction was the condition of the agreement, the weight of authority on the subject applies an objective standard in such cases to determine whether the contract condition has been met. The *Restatement (Second) of Contracts § 228 (1979)* provides:

"When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied."

The comment to the restatement points out that the objective test is appropriate where, from the agreement, it is apparent the obligee has not assumed the risk of the obligor's unreasonable, although honest, dissatisfaction.

In *Kadner v. Shields*, 20 Cal.App.3d 251, 97 Cal.Rptr. 742 (1971), a sale of real estate included the condition that a first encumbrance to be assumed be satisfactory to the buyers. The Kadners as buyers expressed dissatisfaction and when the sellers insisted on performance, the Kadners filed suit for refund of the contract deposit. The question, which the court concluded was one of first impression in California, was whether Kadners were entitled to a good faith exercise of their personal judgment in evaluating the terms of the encumbrances to be assumed or whether their rejection of the conditions was to be measured by the objective considerations of a reasonable man. The court concluded the objective test should be applied. The opinion pointed

---

**2.** The case of *Long v. Huffman*, 557 S.W.2d 911 (Mo.App.1977) touches on the problem of satisfaction, but it announces no standard. Para-

doxically, the opinion, p. 916, suggests a necessity to comply with both tests.

out that the personal judgment test is applied most often in cases of aesthetic taste and sometimes of feasibility of operation or management irrespective of financial impact. The objective test is used where factors of commercial value or of financial concern are involved.

*Kennedy Associates, Inc. v. Fischer,* 667 P.2d 174 (Alaska 1983) is a case virtually identical to the subject suit. Kennedy was a participant in a loan commitment agreement issued to Fischer for the permanent financing of a building addition Fischer was to construct. A condition set out in the commitment precedent to disbursement of loan proceeds included an inspection of the completed property by the lender. The commitment was made subject to the inspection and approval of the completed property by the lender. A Kennedy representative did inspect the structure and gave an unfavorable report on the construction. Kennedy refused to close the loan and Fischer filed suit for breach of the loan commitment. One of the issues on the appeal was whether the trial court had correctly applied the subjective standard of good faith in evaluating Kennedy's reliance on the satisfaction clause. The opinion concluded it had not stating at p. 181:

"It is well-established that where the condition requires satisfaction as to commercial value or quality, operative fitness, or mechanical utility, an objective standard is to be used in determining whether the clause has been satisfied."

The opinion cited the Restatement, Section 228 above and *Meredith Corp. v. Design & Lithography Center, Inc.,* 101 Idaho 391, 614 P.2d 414, 416 (1980). Also mentioned was the choice of the objective standard as a predicate for avoidance, where possible, of the forfeiture of contractual rights.

The present case involved the same considerations existing in the *Kennedy* suit, the economic value of a structure as security for a loan. Brady had no concern with aesthetics of design or any matters of personal taste or judgment. The satisfaction clause involved only a commercial judgment as to whether the stage of construction was to that point of completion as justified the closing of the loan. The objective test to determine whether Brady was entitled to rely on the satisfaction clause as a ground to avoid the commitment agreement was correctly posited in the jury instruction.

### III.

In the final point requiring disposition, Brady contends the award of actual damages to respondents was excessive first, because the element of interest differential was not discounted to present value, and second, because the award included recovery of a portion of the principal sum loaned which could not be a component of damage.

The claim by respondents that damages were sustained when Brady refused to close the loan was supported in part by uncontested proof that interest rates had increased sharply between the date of Brady's commitment letter and the proposed closing date for the loan. As a consequence, when respondents were forced to turn to the open market to replace the loan, the rate they were obligated to pay was 3% higher than the rate quoted in the Brady commitment letter. Respondents produced an expert witness who calculated the amount of respondents' damage attributable to the added 3% interest charge. That computation involved a calculation of interest payable over the term of the loan at the higher rate and a similar calculation of interest at the lower committed rate. According to the witness's testimony, respondents' damage on this item was the difference between the two figures. Brady offered no contrary evidence.

The contention now advanced by Brady is that the jury award of damages based on the interest differential as computed by respondents' expert witness is excessive because the amount was not discounted to present value. Under Brady's theory, respondents incur the extra interest expense only incrementally over the ten year life of the loan and if the full amount is awarded as damages at the outset, respondents are

overcompensated by the value which use of the fund represents.

A calculation which reduces to present value the cost of future expenses is not one readily made by simple mathematics. It entails the assumption of a current rate of return and, in the case of recurrent installments as in the subject mortgage loan, a different amount of the future expense accrues each month. Brady contends in its brief that respondents' damage award was excessive "by nearly $56,000" but the computation of that figure or other amounts mentioned in appellant's brief as the appropriate reduction in the damage award are not ascertainable from the record because Brady presented no evidence on the subject.

The point set out in appellant's brief appears to rest upon excessiveness of the verdict, but as developed in argument, the contention is that the trial court erred in failing to strike the entire testimony of respondents' expert witness who calculated damages. The issue developed at trial in the following manner. Respondents' witness Noble Johnson, a mortgage banker with 33 years of experience, testified as to the computation of respondents' monetary loss attributable to the higher rate of interest and shorter term of the loan respondents obtained to replace the loan committed by Brady. On cross-examination of the witness, counsel for Brady inquired if the computation had taken into consideration any discount to present value. The witness replied that it had not. No further questions were asked. Brady adduced no evidence that such a discount was required or, if so, what the amount would be.

Brady's motion to strike all of witness Johnson's testimony was based on the contention that, as a matter of law, absent a discount to present value, the testimony lacked foundation and was inadmissible. No authority was cited to the trial court to support the contention and none is cited here. Such authorities as are relied on by Brady, principally *Bridgkort Racquet Club Inc. v. University Bank*, 85 Wis.2d 706, 271 N.W.2d 165 (1978), merely hold it to be

error for the court to deny defendant the opportunity to present evidence of what the discount factor would accomplish in mitigating the damage. Here, there was no such offer of proof nor was the witness even questioned as to whether a discount to present value would result in a proper computation of plaintiffs' loss or, if so, what the amount would be.

It is to be assumed that witness Johnson was presented as an expert qualified to make interest loan computations and projections and that his testimony was necessary to aid the jury in arriving at certain elements of the damages claimed. Appellant makes no claim to the contrary nor is any challenge leveled at the witness's qualifications. The issue is whether objection to the foundation of the testimony should have been sustained.

■ Where an expert witness is called, the facts in evidence coupled with those available to the witness from investigation of his own must be sufficient to take the expert testimony out of the realm of guesswork. Any weakness otherwise present in the underpinnings of the opinion given by the witness goes not to the admissibility of the testimony but to its weight and value. *Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir.), *cert. denied* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

■ The matter of Johnson's failure to discount his interest computation was a circumstance the jury could have considered in weighing the testimony, but it was not an omission of any fact necessary to permit an expression by the witness as to the results of his calculation of damages and did not reduce his opinion to inadmissible guesswork or speculation. The jury was made aware by Brady's limited cross-examination that no discount was taken and, had Brady chosen to do so, the effect of a reduction to present value could have been demonstrated by additional cross-examination or by defense evidence or both. Brady is not entitled to complain now that the damage evidence on the subject was only that favorable to plaintiffs. The trial

court correctly overruled the motion to strike the testimony.

In a second branch of the point appellant argues that witness Johnson's testimony was also faulty in that he computed as a part of plaintiffs' loss a "principal balance differential" represented by the amount of the loan owed at the end of a ten year term of the replacement loan as compared to a similar figure which would have been due if the Brady committed loan had been funded. Apparently, the differences in remaining principal balances after ten years of payments are attributable to the fact that the higher rate of interest on the replacement loan reduced the aggregate amount of the installment payments credited to principal. Brady contends inclusion of this figure allowed respondents to recover a portion of the principal amount of the loan which could not by any theory be construed as damages.

We conclude that respondents' judgment for actual damages is excessive by the amount of the principal balance differential because no theory entitles respondents to recoup from Brady a portion of the principal balance of the replacement loan. There is no difficulty in determining the amount of excess, $12,439.00 because the jury verdict corresponded in exact figures to the testimony of witness Johnson. Moreover, respondents present no plausible argument in their brief for entitlement to this element of damages. There is doubt as to whether Brady has preserved the point of excessive verdict by presenting only a motion for new trial and seeking here only the relief of a new trial. Respondents, however, make no claim that the point is not cognizable as presented and suggest themselves that the error, if such it be, may be cured by "remittitur."

The jury verdict for actual damages in the amount of $102,870.00 is in part unsupported by the evidence because testimony improperly calculated part of the principal of respondents' loan as an item of damage. The verdict was otherwise correct and is entitled to affirmance upon deduction of the improper damage allowance.

For the reasons stated, the judgment in favor of plaintiffs and against defendant W.L. Brady Investments, Inc. on Count III of plaintiffs' petition in the amount of $14,-600.00 actual damages and $50,000.00 punitive damages is reversed. The cause as to Count I of plaintiffs' petition is remanded with direction to enter judgment in favor of plaintiffs and against defendant W.L. Brady Investments, Inc. in the amount of $90,-431.00. The costs are ordered divided equally between appellant and respondents.

All concur.