**Harold E. ANDERSON,**
**Plaintiff-Respondent,**

v.

**BURLINGTON NORTHERN**
**RAILROAD COMPANY,**
**Defendant-Appellant.**

**No. 48301.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Sept. 24, 1985.

Motion for Rehearing and/or Transfer
Denied Oct. 28, 1985.

Application to Transfer Denied
Dec. 17, 1985.

C. Marshall Friedman, Newton G. McCoy, Kenneth E. Rudd, C. Marshall Friedman, P.C., St. Louis, for plaintiff-respondent.

Edward W. Mullen, Derek E. Wood, Deacy & Deacy, Kansas City, for defendant-appellant.

SIMON, Presiding Judge.

Burlington Northern Railroad Company (railroad) appeals from a judgment in favor of Harold E. Anderson pursuant to a jury verdict of $800,000.00 in a personal injury action filed against the railroad pursuant to § 45 U.S.C. §§ 51 et seq., the Federal Employers' Liability Act. Anderson sought damages for injuries incurred when a steel shaving got into his eye as he was reaming bolt holes on a hopper car assembly line. We affirm.

This is the second appeal following retrial ordered by us in *Anderson v. Burlington Northern Railroad,* 651 S.W.2d 176 (Mo.App.1983) from which we borrow freely without quotation marks the following recitation of facts. Anderson was an employee of the railroad. His duties required him to ream bolt holes in the metal flooring of hopper cars. He used an airpowered reamer, the exhaust from which caused the metal shavings to be blown into his face at times. He wore safety glasses or spectacles but they did not prevent particles of metal from being blown into his eyes. The evidence was conflicting regarding the availability to Anderson, and the use by other employees, of various types of

safety goggles. On May 6, 1977, while reaming a hole with the exhaust blowing in his face, Anderson felt a pain in his left eye. After finishing the last hole, he went to his foreman, obtained eye wash, and washed his eye. His eye continued to hurt over the weekend. Despite the continued eye irritation, he worked on Monday. On Tuesday when he returned to work, he was sent to a doctor who removed a piece of metal from his eye and attempted to clean the eye by drilling into it. While Anderson continued to work, he also visited the doctor because of pain. About two weeks later, on May 22, Anderson was admitted to the hospital. Surgical efforts to save his eye were unsuccessful; it was eventually removed and replaced with a prosthesis, a plastic eyeball.

The railroad raises nine points on appeal alleging that the trial court erred in the following: (1) refusing to grant a motion for directed verdict or judgment notwithstanding the verdict because Anderson failed to prove that the railroad's negligence caused his injuries; (2) denying a mistrial where the jury surmised that the failure to grant Anderson's request to excuse certain jurors was at the railroad's insistence; (3) failing to discharge the jury or declare a mistrial following a witness' testimony of the railroad's racial bias against the witness, thereby prejudicing the jury against the railroad; (4) admitting Anderson's testimony that the railroad forced his return to work the day after his medical treatment and continued to supply inadequate or ineffective safety goggles to him; (5) admitting certain incompetent medical testimony; (6) admitting testimony by an economist concerning Anderson's past and future loss of wages; (7) denying the motion for new trial or remittitur for an excessive jury verdict; (8) giving a negligence instruction based on M.A.I. 24.01; and (9) refusing to give the railroad's proffered comparative negligence instruction.

We shall set out additional facts only as needed. Railroad's first point contends Anderson failed to make a submissible case. The standard of review to be used in determining whether sufficient evidence has been presented in order to make a submissible case is well established. We must view the evidence in the light most favorable to the plaintiff and disregard defendant's contrary evidence. *White v. St. Louis-San Francisco Ry.*, 602 S.W.2d 748, 751 (Mo.App.1980).

There is no question that Anderson sustained an injury as a result of a piece of steel being embedded in the cornea, near the center of his left eye. Railroad argues that, although Anderson established that the safety glasses issued him by the railroad had gaps which would allow debris to get behind the glasses, no evidence established that the steel particle got in Anderson's eye while he was actually working. Railroad presents other possibilities explaining how the steel particle fell in Anderson's eye. Noting that even if a man had on goggles or a face shield recommended by experts on eye protection, if he took them off and wiped his forehead because he was hot, a piece of metal could be shaken from his eyebrows, forehead, or gloves; be rubbed into the eye; and be forced in by the eyelid.

▮ Testimony by Anderson established that the safety glasses issued to him and worn by him at the time of his injury were essentially spectacles, horn-rimmed glasses with perforated plastic side shields. He testified metal shavings, blown by the exhaust from the reamer, would get in his clothes, hair, face, eyebrows, in the vicinity of the eyes, and in the eyes of other workers on numerous occasions through the gaps at the top and bottom of the eyeglass frame, at the brow, around the cheeks and adjacent to the nose. Several other men, employed similarly to Anderson, had complained about getting shavings in their eyes while wearing the safety glasses. Anderson also testified that while working he felt a pain in his eye. Ample evidence was before the jury on this matter for it to conclude that the railroad's negligence in furnishing inadequate eye protection caused Anderson's injuries, despite the railroad's alternative explanations for causa-

tion on how the injury occurred. Point denied.

The railroad's second point alleges error in the denial of its motion to discharge the jury. During the voir dire of the jury panel, one of the male jurors, Mr. Webbe, informed the court he was allowed only one week's paid absence from his employment for jury duty. Despite his willingness to contribute the second week as a civic obligation, he was concerned over the possibility of the trial going into a third week. Out of the hearing of the jury the court advised the attorneys that if they believed Webbe's ability to concentrate on the case could be affected, the court would release him if both agreed. Anderson's counsel approved. The railroad's counsel, mindful that few men were on the panel and, more importantly, that Webbe used both air electric drills and reamers requiring him to wear eye protection in his employment, refused his consent to excuse Webbe.

The proceedings returned to the hearing of the jury and Anderson's counsel inquired of Webbe whether there was "a problem inasfar as you are concerned." Webbe again repeated that he would get paid only for five days. Anderson's counsel thereupon moved "that the juror be dismissed, we have extra jurors down here," notwithstanding the preceding bench conference where the railroad's counsel had refused his consent to excuse Webbe. Immediately thereafter, the railroad's counsel approached the bench and, out of the hearing of the jury, moved to discharge the jury panel stating Anderson's attorney was guilty of a deliberate attempt to prejudice the jury against the railroad. The motion was denied. The railroad argues the actions of Anderson's counsel curried favor with the jury, especially with Webbe, by revealing that Webbe was retained at the railroad's insistence, despite Anderson's willingness to excuse him.

Neither Webbe nor the panel was ever advised in any manner that the railroad objected to or opposed Webbe's being excused. Earlier during the course of the voir dire examination, the trial court had determined not to excuse another venireman because of job problems. In the eyes of the jury, the trial court, not the attorneys, made the final determination not to excuse Webbe. The court exercised its discretion in the manner requested by the railroad by denying Anderson's motion to excuse Webbe. The railroad's determined efforts to have Webbe retained on the panel were successful. Regardless of railroad's characterization of the remark made by Anderson's counsel, the record fails to support that either Webbe or the entire jury panel perceived that it was at the railroad's insistence that Webbe was not excused, thereby engendering their prejudice against the railroad. The trial court is vested with broad discretion in the control of counsel's conduct during voir dire and his ruling thereon will not be disturbed unless the facts indicate a manifest abuse of discretion, *Missey v. Kwan*, 595 S.W.2d 460, 462[2] (Mo.App.1980), because the trial court is in a better position to gauge the effect on the jury panel of the matter claimed to be prejudicial, *see Smith v. Aldridge*, 356 S.W.2d 532, 536 (Mo.App.1962). The trial did not exceed two weeks, so Webbe incurred no undue hardship by his jury service; therefore, we find no prejudice to the railroad and no abuse of discretion by the trial court. The incident certainly does not warrant reversal. *Everett v. Bishop*, 680 S.W.2d 779, 781 (Mo.App. 1984).

In the same point railroad also complains of the actions of Anderson's attorney concerning Mr. Winkelman, a juror, who had advised the court near the end of the trial he would lose his job if the trial went into a third week. On the final Thursday of the second week, the court requested the jury to determine whether it wished to complete the case on Saturday or Monday. The jury voted for Monday whereupon the court advised them, since Winkelman "would lose his job if he had to come back Monday," their selection of Monday would require that the alternate juror be substituted. A recount produced the same result. The

court then requested to know whether the substitution for Winkelman could be made. Railroad's attorney asked to approach the bench. Out of the jury's hearing, railroad's attorney stated he did not wish to make the decision to excuse Winkelman. At his request, the decision to excuse Winkelman was deferred until the following morning, on Friday, so that Winkelman's employer could be contacted. Proceedings resumed before the jury. After they were eventually excused on Thursday for the evening, the court learned Winkelman would be available Monday if he worked Saturday. The railroad claims the occurrence prejudiced it by placing railroad in the position of being the "villain" by requiring Winkelman to stay on Monday and lose his job merely because railroad desired to keep Winkelman, one of the only two males on the jury panel. The record reveals no objection during this scenario was made by railroad. We review the incident for "plain error." Rule 84.13(c).

■ The requisite prelude to plain error review occurs where the circumstances are characterized as having engendered hatred, passion or prejudice resulting in manifest injustice or a miscarriage of justice. *Executive Jet Management & Pilot Service, Inc. v. Scott*, 629 S.W.2d 598, 607[7] (Mo.App.1981). Nothing in the record reflects that the jury knew the railroad was willing to retain Winkelman on the panel at the expense of his job, because the proceedings were conducted outside the hearing of the jury. The jury was not informed that the railroad might not consent to Winkelman's being excused. The decision pertaining to Winkelman was expressly postponed to the following morning where the court learned the problem was resolved and that Winkelman could finish his jury service without jeopardizing his job. No decision was made to keep Winkelman as a juror and have him lose his job. No showing exists of any prejudice to the railroad tantamount to manifest injustice or a miscarriage of justice. The railroad's second point is denied.

The railroad's third point alleges error for the failure of the trial court to discharge the jury and declare a mistrial following a witness's testimony implying the railroad's racial bias against him, thereby prejudicing the railroad because seven of the twelve jurors were black. Mr. Davenport, a black man and one of Anderson's co-workers, was called by Anderson as a witness and testified generally to the working conditions at the time of Anderson's injury. During direct, cross and redirect examination, no mention or reference to race was elicited. On re-cross examination, the railroad's counsel attempted to impeach Davenport's testimony that he did not "have time to see what everybody else was doing." The following colloquy occurred:

Q. [By Mr. Mullen] All right. I think that's all. You say you didn't have time to do anything but work eight solid hours a day on the hopper line reaming these holes. Mr. Davenport, did you ever get in trouble for coming in late, leaving early for lunch?

MR. FRIEDMAN: Pardon me, Your Honor. I don't think that has any bearing.

THE COURT: Sustained. The jury is instructed to disregard that.

Q. (By Mr. Mullin): Well, may I ask, Mr. Davenport, did you from time to time leave the hopper line to go over and engage in social telephone calls in the office?

A. Telephone calls in the office?

Q. Yeah, right.

MR. FRIEDMAN: Again, your Honor.

THE COURT: Overruled, cross examination. Go ahead.

Q. (By Mr. Mullin): And get called down for it?

A. Called down for what, telephone calls?

Q. Yeah, right, right.

A. Mr. Mullen, they tried to get on me for anything. I was the only black person in that shop just about. You know, anything they could catch me trying to do they would try to get rid of me. Back in '77 they didn't want

me to work there in the first place, that's why they gave me a little peon job because they thought I would quit but I didn't.

The railroad made no objection or motion to strike Davenport's answers; instead, counsel continued his line of questioning whether disparate racial treatment had occurred. Again, when the witness stated that he "didn't quit. I got laid off, you know," the railroad's counsel inquired whether or not it was true that everyone else with his seniority or less had likewise been laid off. Davenport responded:

[Y]ou don't see my point. I'm saying one toad out of a hundred and twenty you're definitely going to see me. I don't care what I do you're going to see me mess up. I don't care what it is because I stick out like a fly in a churn of buttermilk, they were on me all of the time.

Following additional questioning during the re-cross and further redirect examination by Anderson's attorney, Davenport was finally excused. The railroad's counsel then complained Davenport's remarks were gratuitous and non-responsive, and requested a mistrial which the trial court denied. The trial court did instruct the jury to disregard the testimony pertaining to race.

When a witness unexpectedly volunteers an inadmissible statement, the action called for rests largely within the discretion of the trial court who must evaluate the situation and ascertain if some remedy short of a mistrial will cure the error, and appellate review of the trial court's decision is to verify that the trial court has not abused its discretion. 629 S.W.2d at 611[37]. A declaration of a mistrial is the most drastic remedy for trial error and should be granted only in those cases where the error is so prejudicial that its effect can be excised in no other way. *Id.* [38]. The trial court was in a superior position to assess whether his admonition to the jury was sufficient to lessen the sting of the witness's comments invited by the railroad's line of inquiry. We find no abuse of the trial court's discretion in deny-

ing the railroad's motion for mistrial. Point denied.

The railroad's fourth point claims error in the admission of Anderson's testimony that he was "forced" to return to work the day following his initial medical treatment and of his counsel's comments in his opening statement to the effect that the railroad continued to furnish Anderson with ineffective eye protection upon his return despite his surgery. Railroad states the foregoing evidence was irrelevant and prejudiced the jury against the railroad. The gist of the railroad's argument is that Anderson did not present sufficient evidence to establish a causal connection between his eye infection and his alleged "forced" return to work. The railroad also argues that the evidence was improper because it permitted the jury to infer Anderson's return to work caused or contributed to the infection in his eye causing its eventual removal.

At trial the railroad had requested by motion in limine to exclude any testimony, evidence, or statement that the railroad in any manner forced Anderson to return to work following his initial medical treatment. The trial court denied the motion. When Anderson began to testify at trial about the events prompting his return to work following his initial medical treatment, the railroad objected on the ground that Anderson's testimony was improper and outside the scope of the pleadings. The trial court sustained the objection prompting Anderson's attorney to suggest the court review the pleadings. In the railroad's answer to Anderson's first amended petition, the railroad alleged as an affirmative defense that Anderson voluntarily continued his work duties and subjected himself to an increased likelihood of infection and injury without being required by the railroad to do so and without making known to the railroad the extent of his symptoms or condition of his eye. Subsequently, the judge overruled the railroad's further objection on relevancy that the evidence failed to indicate a connection be-

tween Anderson's return to work and the subsequent eye infection.

■ The evidence admitted is relevant and probative on the issues whether Anderson's return to work was a result of the railroad's negligence or Anderson's actions as alleged. No effort was made by the railroad to limit by instruction the purpose for which the jury considered this evidence. We deny railroad's fourth point.

■ The railroad's fifth point contends certain medical evidence was improperly admitted. Without addressing whether such evidence was improperly admitted, our review of the trial record reveals that the deposition of another medical expert containing substantially the same evidence complained of here had previously been read to the jury with no objection by the railroad. One cannot be heard to complain of the admission of testimony over his objection, where evidence of the same tenor has been admitted without his objection. *Laughlin v. Kansas City Southern Ry.*, 275 Mo. 459, 205 S.W. 3, 8[13] (1918); *Mathews v. Chrysler Realty Corp.*, 627 S.W.2d 314, 319[7] (Mo.App.1982). We need not further address the railroad's complaint. Point denied.

The railroad's sixth point alleges error in the admission of testimony and exhibits concerning Anderson's past and future wage losses and the trial court's refusal to give withdrawal instructions because the testimony constituted speculation and was not supported by competent evidence. The expert testified extensively from the exhibits but the record on appeal does not contain those exhibits whose accuracy the railroad disputes. Railroad argues that the expert witness's calculations were based on speculative assumptions, and challenges the expert's conclusion that spray painters' wages and carmen's wages would both increase in the future. Railroad states that the expert gave no basis for his conclusion about spray painters' wages and that his explanation for carmen's future wage increases was incomprehensible. Railroad concludes that the jury was induced to return an excessive verdict by the speculative testimony concerning damages. We do not agree.

■ The ultimate test for damages is whether the award will fairly and reasonably compensate the plaintiff for his injuries. *Sampson v. Missouri Pacific R.R.*, 560 S.W.2d 573, 588[25] (Mo. banc 1978). Anderson's expert witness, an economist and economics professor, testified concerning Anderson's past and future wage loss. The expert calculated $136,652.00 to be Anderson's past wage loss from the time of his injury to the time of trial, a period of 6½ years, based on an hourly rate in a 40 hour week paid to a journeyman-carman. He reduced this figure by twenty percent, the difference between the wages paid a journeyman-carman and an apprentice helper such as Anderson, and then he subtracted all actual earnings of Anderson from May, 1977 to October 31, 1983. After making the two subtractions, he calculated Anderson's past wage loss to to approximately $80,843.00. No addition was made for salary increases likely to accrue to Anderson as he approached journeyman status during the completion of his apprenticeship during this period. Since Anderson had also worked as a custom spray painter for automobiles and tractor trailers, the expert witness offset Anderson's alternative income potential as a custom spray painter against any deduction which might otherwise be required for layoffs or furlough periods on the railroad when Anderson would not have earned wages. The expert's personal knowledge that spray painters in Missouri earned $20.00 an hour, plus fringe benefits was corroborated by another witness, a former seller of trucks and trailers in Springfield, Missouri, for whom Anderson had done custom spray painting prior to his accident.

■ The extent of future harm to the earning capacity of the injured person is measured by the difference as of the time of trial between the value of plaintiff's services as they would have been in view of the injury and as they would have been had there been no injury. *Id.* at

589[27]. A figure for loss of wages is not to be permitted when formed from speculation and conjecture, but only when established with reasonable certainty upon which substantial evidence must be introduced. *Id.* [28].

The expert's calculation of future wage loss used two figures, $26,894 per year, based on Anderson's rate of pay as a carman (or a spray painter earning at least that much), and $6,968 annually, based on the minimum wage at the time of trial for entry level work based on testimony by a rehabilitative counselor that Anderson's employment was limited to entry level positions not intellectually demanding. The $19,926 difference between these two annual wages represented Anderson's annual wage loss basis for the future. The expert witness computed the present value of Anderson's future earnings as a carman at three different retirement ages, figuring that Anderson at age 25 would likely retire at the age of 62, 67, or 70 years. To compute the present value of Anderson's future loss of income, the expert reviewed carmen wages from 1962 to 1983 and arrived at an annual wage percentage increase and then, based upon the relationship of past wage increases to interest rates on tax free high grade bonds, taking inflation into account, demonstrated that the rate of increase of carmen's wages on the average for the past twenty years was greater than the increase in interest rates by about 2%. He adjusted the 2% differential downward to 1½% due to current rising interest rates. No specific projections of exact interest rates, wage increases, or inflation were made. The witness testified he could not predict the future rate of inflation and interest, but indicated the relationship between interest rates, wage increases, and inflation has been historically constant.

After computing the present value of future carmen earnings for the three retirement ages of 62, 67, and 70, the expert computed the present value of future minimum wage earnings at the three retirement ages. He subtracted the lesser, minimum wage figures from the future carmen earnings to derive the present value of the future wage loss at the three retirement ages. To each of these, he added the approximate $80,843.00 past wage loss to derive Anderson's total wage loss, both past and future (presently valued), resulting in a total wage loss of $876,562 at age 62; $997,285 at age 67; and $1,071,079 at age 70. Fringe benefits were not included in the calculations to offset the tax consequences.

■ Inevitably there is a degree of speculation to the determination of a fairly approximated present-value award compensating plaintiff for what he would have earned but for his injury, but we do not find such speculation, when based upon the use of facts in reasonable calculations, to be so purely conjectural as to improperly influence the jury's verdict as to damages. *Id.* The expert's calculation of damages based on a correlation between interest rates and earnings is a projection; nevertheless, it is a prediction based upon reasonable certainty. The railroad's excerpts from cross-examination reflect its intent to undermine the methodology of the economist. However, the relative weakness or strength of the factual underpinning of the expert's opinion goes to the weight and credibility, rather than admissibility. *Hall v. W.L. Brady Investments, Inc.*, 684 S.W.2d 379, 388[8] (Mo.App.1984). The trial court did not err in admitting the expert's testimony or in refusing to give railroad's proferred instructions withdrawing evidence of Anderson's past and future wage losses.

■ The railroad's seventh point claims error in the denial of its motion for new trial for the failure to grant a remittitur, contending the $800,000.00 verdict was excessive and indicative of jury prejudice against the railroad. The trial court may find passion and prejudice by the jury from the excessiveness of the verdict alone. *White v. St. Louis San Francisco Ry.*, 602 S.W.2d at 754[5]. When the trial court has made no such finding, the appellate court will defer to the trial court and will not

make a finding of passion or prejudice from the amount of the verdict alone. *Id.* [6]. Here the railroad argues that two errors already raised in this appeal induced prejudice in the jury. The errors defendant highlights include the testimony of Anderson's economist about Anderson's future wage loss and the testimony of Anderson's fellow employee imputing racial bias to the railroad. Since we have already ruled against the railroad on these alleged errors which underpin this charge of error, we likewise rule against the railroad on this point. *Id.* at 755.

■ The railroad alternatively contends that if we reject its claim that the verdict was a result of prejudice of the jury, we should find under the rule of uniformity that the verdict was excessive and remit it by one-half. Under these circumstances, we find the recent pronouncement that the doctrine of remittitur is abolished in Missouri controls. *See Firestone v. Crown Center Redevelopment Corporation,* 693 S.W.2d 99, 110[14] (Mo. banc 1985). Railroad's request for remittitur is denied.

■ Railroad's eighth contention is that the trial court erred in submitting M.A.I. 24.01 as the verdict director because the instruction, by submitting general negligence and not specific negligence, gave the jury a roving commission and because the instruction denies railroads engaged in interstate commerce equal protection of the law. Railroad has lost, as it candidly admits in its brief, the "roving commission" argument before the Missouri Supreme Court. *Bair v. St. Louis-San Francisco Ry.,* 647 S.W.2d 507, 510–511[5] (Mo.banc), *cert. denied sub nom., Burlington Northern, Inc. v. Bair,* 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 109 (1983); *Ball v. Burlington Northern Ry.,* 672 S.W.2d 358, 361[1] (Mo.App.1984). We have no alternative but to deny railroad's point.

■ Railroad also contends the giving of M.A.I. 24.01 denied it equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution because the instruction singles out and imposes greater liability and burdens upon interstate railroad carriers than it does any other corporate or private individual defendant. The constitutional attack based on the equal protection argument on the instruction has been raised before and summarily rejected. *See Fravel v. Burlington,* 671 S.W.2d 339, 341 (Mo.App.1984), *cert. denied sub nom. Burlington Northern Ry. Co. v. Fravel,* — U.S. —, 105 S.Ct. 907, 83 L.Ed.2d 921 (1985). Point denied.

■ In its final point, railroad contends the trial court erred in refusing to give its tendered verdict form, a combination of M.A.I. 36.01 and 36.15, requiring the jury to separately state the total amount of damages and the percentage of fault attributable to Anderson and the railroad. Instead, the trial court gave M.A.I. 36.01 as its verdict form, in addition to M.A.I. 24.01 (verdict director—F.E.L.A.), M.A.I. 8.02 (damages—F.E.L.A.), and M.A.I. 32.07 (affirmative defense—contributory negligence —F.E.L.A.). Railroad argues that since our Supreme Court adopted apportionment of fault among joint tortfeasors in *Missouri Pacific Railroad Co. v. Whitehead & Kales Co.,* 566 S.W.2d 466, 473 (Mo. banc 1978) and comparative fault between plaintiff and tortfeasor, *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), F.E.L.A. cases should be governed by the same process, so that the use of its tendered verdict form should be mandatory. We disagree.

M.A.I. 36.15 was proposed following the decision in *Whitehead & Kales.* While normally the jury inserts on the verdict form the names of parties found liable, the Note on Use #6 to M.A.I. 36.15 specifically requires the preparer of the form to insert the names. The Committee's Comment states the purpose of Note on Use #6 is to forestall any attempt on the part of the jury to assign any part of the fault to the plaintiff. The instruction conforms to the holding in *Whitehead & Kales* which apportioned fault only between joint tortfeasors, and not the tortfeasor and plaintiff. *Gustafson,* decided after the present case, specifically states its applicability was to operate prospectively only. 661 S.W.2d

at 15. Thus, the trial court here had no alternative but to give M.A.I. 36.01 as its verdict form. Its actions were proper. Rule 70.02(b).

As a sub-point, railroad also contends that the failure of the trial court to give its verdict form violates the Fourteenth Amendment to the United States Constitution and constitutes an undue burden on interstate commerce in violation of Article I, Section Eight of the Commerce Clause. The constitutionality of the Federal Employers' Liability Act has been repeatedly upheld and we find no reason to question the constitutionality of the verdict form.

Judgment affirmed.

STEPHAN, C.J., and LOWENSTEIN, Special J., concur.